Harriette O'Neil Gillette, Executrix of the Estate of Edwin F. Gillette v. Commissioner.Gillette v. CommissionerDocket No. 15623.United States Tax Court1949 Tax Ct. Memo LEXIS 286; 8 T.C.M. (CCH) 91; T.C.M. (RIA) 49024; January 25, 1949Daniel A. Taylor, Esq., for the petitioner. H. H. Hart, Esq., for the respondent. DISNEYMemorandum Findings of Fact and Opinion DISNEY, Judge: This case involves estate tax. Deficiency was determined in the amount of $40,653.10. The question presented is whether decedent transferred his interest in two pieces of property in contemplation of death within the intent of section 811(c) of the Internal Revenue Code. No issue is taken by the petitioner with the values placed by the Commissioner on the properties. The parties have stipulated that additional expense in the administration of the estate may be determined under Rule 50. A stipulation of facts was filed, is adopted by reference, and the facts therein set*287 forth are found by us. Such parts of the stipulated facts as are regarded as pertinent are included, with facts found from evidence adduced, in our Findings of Fact The petitioner's decedent, Edwin F. Gillette, was born on October 19, 1863, and died on December 10, 1943, a resident of Pasadena, California, leaving him surviving his widow, Harriette O'Neil Gillette; two sons, Hyde and Edwin, and two daughters, Helen Gillette and Marietta Will. The estate was administered in the Superior Court of the State of California in and for the County of Los Angeles. The executrix is decedent's widow. On September 17, 1938, the decedent and his sister, Mrs. William S. Jenks, each owned, by inheritance from their father, an undivided one-half interest in three real estate properties, as follows: The Hartford Building, on Madison and Dearborn Streets, and the "Michigan Avenue property" on South Michigan Avenue, both in Chicago, Illinois, and the "Lake Beulah property" at Lake Beulah, Wisconsin. On that date decedent conveyed his interest in the Hartford Building to his son Hyde in trust for decedent's four children, conveyed his interest in the Michigan Aveue property to Hyde as trustee, *288 and conveyed his interest in the Lake Beulah property by warranty deed to the four children. Decedent was at the time a widower but was contemplating marriage with Harriette Marie O'Neil and on September 19, 1938, they entered into an ante-nuptial agreement in writing. The trust deed covering the Hartford Building provided, in material part, that, in consideration of the trustee's assumption of and agreement to pay, but only from assets of the trust, decedent's indebtedness on promissory notes to his sister Mrs. William S. Jenks in the amount of $40,000 and $4,000 accrued unpaid interest, and to pay future interest, the decedent transferred his half interest in the Hartford Building; that trust income should be paid equally to decedent's four children, for life, and, under the will of any child dying, to descendants or spouse of any such child; that the trust should terminate upon the death of the last survivor, of the four children, and Mrs. William S. Jenks, but after death of Mrs. William S. Jenks could be terminated, by written instrument signed by a majority of the children; that upon termination of the trust the trust principal, including any accumulated income, should be distributed*289 to the four children, if living, and to the issue of any deceased child, or to his appointee by will, otherwise equally to the survivors among the four children, and per stirpes to issue of any other deceased child; that a majority of the four children or the survivors thereof could by writing alter, modify, or change the trust in any respect, but not, after the death of one, so as materially to affect the rights of those substituted for a deceased child. The note referred to in the trust instrument as for $40,000 and accrued interest was, in fact, for $41,560. It was a renewal on December 23, 1936, of a note for $34,000 given by decedent to his sister in 1931. Decedent paid the interest in 1931 and 1932 but never thereafter. On September 17, 1938, Hyde wrote decedent a letter stating, in material part, that he as trustee assumed and agreed to pay, but only out of the trust assets, the indebtedness to Mrs. Jenks, and would save decedent harmless with reference thereto. Since that time the trustee has paid the interest to Mrs. Jenks from that trust, it being unnecessary to call upon the Michigan Avenue trust for any interest, (under the provisions hereinafter set forth). The record*290 does not disclose whether Mrs. Jenks released the decedent from the indebtedness on the note. The trust instrument conveying the Michigan Avenue property to Hyde Gillette as trustee provided, in material part, that trust income should be distributed as follows: To the settlor, the decedent, except that Mrs. William S. Jenks should during her life receive $1,000 a year or such part thereof necessary to pay her $1,000 a year whenever the trust covering the Hartford Building did not pay her that much interest on the $40,000 indebtedness; that after settlor's death income should go to assure Mrs. William S. Jenks $1,000 a year either from the Hartford Building trust or the Michigan Avenue property trust, and if settlor should marry and leave surviving him a widow who was living with him at his death to pay such widow $1,500 per year for life; that other income should be paid for life to decedent's four children or to their descendants or spouses as appointed by their wills, or in case of no such appointment, per stirpes to their surviving issue, or, if none, to surviving issue of the decedent; that the trust should terminate on the death of the last survivor of the four children, Mrs. *291 William S. Jenks, and settlor's widow, or by a written instrument signed by a majority of the children; that upon termination of the trust, principal and accumulated income should be distributed equally to the four children if living, but if any were dead to his issue or appointees by will; that the trust could, after death of the settlor, his widow, and Mrs. William S. Jenks, be altered, changed, or modified in any respect by a written instrument signed by a majority of the settlor's living children, but not to affect materially the rights of those substituted for a deceased child; that the trust could be terminated, altered, or modified in any respect at any time by the settlor, in writing. The ante-nuptial agreement between decedent and Harriette Marie O'Neil provided, so far as material, as follows: That the parties contemplated marriage; that Harriette O'Neil "has been fully informed as to what her statutory rights would be" as wife, or widow; that decedent had recently conveyed his half interest in the Hartford Building in trust for his four children, subject to a mortgage of $85,000 against the whole property; that after deducting one-half of the $85,000 it is estimated that*292 the half interest is worth $175,000; that decedent was indebted to his sister, Mrs. William S. Jenks, on promissory notes totaling $40,000, with accrued unpaid interest of $4,000, and that the trustee has assumed that debt, from which it is contemplated the sister will release him, the decedent; that he has recently conveyed his one-half interest in the Michigan Avenue property "in trust for the ultimate benefit of his four children;" that his half interest is estimated to be worth not more than $100,000; that he is to receive for life the net income, which was $6,000 under a lease, subject to possible payment of $1,000 a year to Mrs. William S. Jenks; that he has recently conveyed outright his half interest, estimated to be worth $10,000, in the Lake Beulah property to his four children; that he owns a residence in Pasadena, California, 333 acres of mountain property, and a mining property in Colorado, and securities and personal property, estimated at $10,000; that he intends to provide $1,500 a year, from income of the Michigan Avenue property for his wife for her life after his death; that it is the intent of Harriette O'Neil to waive, relinquish, and bar her dower interest as*293 wife or widow and homestead rights in decedent's property owned or to be owned by him; therefore, that in consideration of the payment to her of the $1,500 per year for her life after decedent's death, and in consideration of marriage, Harriette O'Neil relinquishes, bars, and surrenders all her rights because of marriage, both dower and homestead, in the property owned or to be owned by the decedent, that she will join him, his heirs, administrators, executors, or assigns in any conveyances thereof, and he, his heirs, executors, administrators, or assigns may convey such properties without her joining. The decedent was not a man of business. Though well educated, including a course in architecture, he followed neither that profession nor any other for a livelihood. He was interested in studying and composing poetry in French, and in doing beautiful cabinet work in a workshop, interested himself in his fraternities and the publication of one, in a hunt club, a choral society, a tennis and swimming club. He drove a car a great deal and was interested in photography. He devoted all of his time to the above pursuits. Since 1917 he had resided in Pasadena, California. He lived upon the*294 income from property inherited from his father. He and his sister, Mrs. William S. Jenks, had inherited, in equal shares, three pieces of real estate, that is, a summer home at Lake Beulah, Wisconsin, a 14-story office building in the Loop district of Chicago, hereinafter called the Hartford Building, and a property on Michigan Avenue, Chicago, referred to hereinafter as the Michigan Avenue property. The latter was in 1931 subject to a 198-year lease, producing $12,000 a year; also an option, held by the lessees, to sell to the lessee for $375,000, $75,000 of which had been paid. To assure delivery of and good title to the property under the option the Jenks family and decedent and his then wife had in 1931 given a bond for $75,000, secured by a trust deed on the property. The lessee-optionee was required either to erect an office building or put up as a guaranty for such erection $100,000 in securities by March 1, 1939. The Hartford Building was in the hands of building managers, employed by Hyde Gillette, under power of attorney from his father and aunt. It was subject to a mortgage for $85,000. From December 1933 to September 1938 the building was in a rundown condition and had*295 produced no net income for its owners, except $310 to each in January 1938 and $593.78 to each in August 1938. Decedent's half interest was worth about $120,000. His interest in the Lake Beulah property was worth about $10,000. The decedent also owned his home in Pasadena, California, estimated by him to be worth $15,000, about 333 acres of mountain land in Estes Park, Colorado, estimated by him to have a value of $16,000, a mining property in Colorado, estimated by him to be worth $5,000, and securities and other personal property which he estimated at $10,000. He estimated his interest in the Hartford property was worth about $175,000 above the mortgage, and that his interest in the Michigan Avenue property was worth about $100,000. In 1938 Mrs. William S. Jenks and her husband, Hyde Gillette and Marietta Will lived in or near Chicago. Hyde, now aged 42, was an investment banker in Chicago. Marietta's husband, Howard Will, now aged 49, had been an attorney in Chicago since about 1924. The Gillette and Jenks families had a close friendly relationship. Mrs. Jenks was very fond of her brother's children. She had no other nieces or nephews. She and decedent were very devoted to each*296 other. On May 8, 1938, the decedent wrote Hyde, with an identical letter to each of the other children, in effect, that he had been urging one Harriette O'Neil to marry him, but that she hesitated to come into the family, and to give up the freedom which as a bachelor girl she had long enjoyed; that they were lovers "seeking such happiness as may be found at this late date"; that he would welcome any procedure tending to overcome her diffidence in meeting the members of the family; and that he hoped the letter would have favorable consideration. Harriette O'Neil was then 41 years of age; the decedent 75. The decedent's children, upon learning of the suggested marriage, were pleased at the prospect, except that the record does not indicate the attitude of Helen. Hyde discussed the proposed marriage with the Jenks family first in May 1938 shortly after he received his father's letter. Mr. Jenks, who largely looked after his wife's interests, took a different view from that of the children, and his wife to a lesser degree. He did most of the talking on the subject, and at times was loud and bitter on the subject. It was discussed by Hyde and the Jenks family several times, both*297 in Chicago during the summer and at Lake Beulah in August and September. Howard Will joined in the later discussions. The Jenks family was unhappy at the idea. They did not see how decedent could afford to marry, and pointed out that he was receiving only $6,000 per annum from his interest in the Michigan Avenue property; that he was indebted to Mrs. Jenks on a note, upon which he was not paying the interest; and that they felt that he should not take on additional obligations; also that marriage involved additional expense and that decedent might possibly encumber his sister's interest in the Hartford Building and Michigan Avenue properties; and that if the optionees on the Michigan Avenue property elected to purchase, it might not be possible to give clear title. Jenks pointed out that this might be ruinous for the two families because the Michigan Avenue property represented their only remaining source of income. Jenks at one time said that he would see that decedent was sued for collection of the notes before he incurred further obligations, or he would stop the marriage. Mr. and Mrs. Jenks did not insist that the two trusts contain provisions relative to the distribution of corpus*298 to the children at termination. Their primary interest was to get the note secured. Will never explained to them the complete distribution of the trust corpus. Jenks and his wife, as to the Lake Beulah property, also indicated that having a new head of the family brought to Lake Beulah would be complication. Decedent had not been paying promptly his share of the expense of that property. It was used by both families, including grandchildren, as a summer home. Hyde Gillette felt that he would like to do anything he could to prevent a rift in the family, and resolved to try to do something to prevent Jenks expressing his strong feelings about the unpaid note. He approached Jenks, pointed out the feeling that was developing between decedent and his sister, and asked if he could not do something to keep harmony. There had been acrimonious exchange of letters in the past, which had "blown over," and Hyde knew that decedent would become excited and extremely headstrong if Jenks repeated his statements to decedent. Hyde counselled Howard Will and his law firm, and it was felt that the decedent's indebtedness to Mrs. Jenks might be secured by his interest in the Hartford Building. After*299 further discussion it was decided that since Hyde was handling the Hartford Building he might as well be appointed as trustee and the Hartford Building transferred in trust to him. Jenks was adamant on Mrs. Jenks receiving some interest and Hyde decided that he would see that she was guaranteed at least $1,000 per year out of the approximately $2,000 interest due her, so he proposed that part of the decedent's $6,000 income from the Michigan Avenue property assure Mrs. Jenks of the $1,000; and he felt that a trusteeship in him, over the Michigan Avenue property, was a logical vehicle to assure the payment of the $1,000 to Mrs. Jenks, if the Hartford trust was unable to do so. The Michigan Avenue trust was also created to assure delivery of title, in case of exercise of the option, as Jenks suggested that an uncooperative wife of the decedent might hamper the transfer under the option and cause default. Such a trust would also make it more difficult for decedent to encumber his sister's interest. Howard A. Will prepared the trusts. Hyde did not desire to engage in correspondence on the subject and wanted to handle it orally with his father. He did not wish to create friction between*300 his father and Jenks. His father was never told about Jenks' statement about suit on the note; but the decedent did know that the Jenks family had objections to the marriage, in connection with the indebtedness on the note. Hyde and Will explained, in general, to Jenks and wife what they contemplated doing. On June 23, 1938, Miss Harriette O'Neil came through Chicago on the way to visit farther east. She had lunch with Hyde Gillette, whom she then met for the first time, and left that evening for the east. The decedent had previously told her that his family was pleased with the idea of the proposed marriage to her, but that Jenks and wife were not pleased, that his sister was annoyed, and that he was behind on interest but the pressure came when possible marriage came up. He had said nothing to her about a pre-nuptial agreement. She met Hyde at decedent's suggestion because she wished to meet all his family before the marriage. She spent about an hour and a half with Hyde. He seemed very friendly about the marriage, told her that the Jenks family was not pleased, from a financial point of view, mentioned a large debt, and that the Jenks family felt that his father could not take*301 on extra expense, that the upkeep of the Lake Beulah property was a burden, and that possibly his father and his wife would not be interested in coming to Lake Beulah regularly, and perhaps some arrangement could be made for them to come as guests once in a while. She told him she so preferred, rather than continue the upkeep and joint ownership and use. She was not concerned because she thought probably some arrangement could be worked out to satisfy the Jenks family. Ante-nuptial agreement was not mentioned. Hyde told her that he and Mr. Will were working on a plan which they thought might take care of the matter and not jeopardize his father's interest. He mentioned the plan in general terms. It had not at that time been completely formulated. It was not until later, after talks with Jenks and his wife, that Hyde and Will arrived at a definite plan. It was entirely completed before the decedent came east, but no documents had been drawn because Hyde wished to discuss the matter with his father and see what he thought of it. About August 1, 1938, decedent arrived in Chicago. He and Hyde had lunch together that day. Hyde told him in general terms of Jenks' attitude toward getting*302 some payment on the notes, and then suggested the arrangements that had been decided upon. He did not tell his father what Jenks had said about suit on the note; did not wish to make his father angry. Decedent's reaction to the plan was that if Howard (Will) and Hyde "thought it was all right and it met the problems that had arisen, for us to go ahead and draw the instruments." The matter was discussed practically not at all with the decedent after the instruments were prepared. Hyde gave the instruments to his father to read and explained them in general, not in detail but more in terms of the general principles involved. He told his father that his one purpose was to permit him to continue a happy life and to get married with the friendly feeling of all the family, which could be accomplished by some arrangement definitely to take care of the interest on the note. Decedent left the matter entirely in the hands of Hyde and Howard. Hyde tried to make it perfectly clear to his father what the documents meant and covered, but had no special conference with him. Hyde originated the idea of transferring the Lake Beulah property, and the idea of providing $1,500 per year for the new wife, *303 in order to make the arrangement acceptable to his father. There was no discussion of a will. It was Hyde's purpose to keep the Jenks family and his father apart and they never discussed the matter in Hyde's presence. Hyde knew what he wished to accomplish. He does not remember ever showing the documents to Jenks or his wife. He told her in a general way what they contained. Jenks did not suggest any method of getting interest paid on the note. Hyde took it upon himself to find a way. He showed his father and Mrs. Jenks that the Hartford property was gradually improving and he thought that some day the earnings would also improve. Though the trust on the Michigan Avenue property was revocable, Hyde did not then feel that his father would revoke it, thinking his father was not sufficiently interested in business details to take the trouble to make that step. Howard Will was never asked by the decedent to prepare the transfers. During July and August 1938 Hyde and he discussed the matter. Will devoted several days to drafting the instruments. One of the senior members of his firm, who collaborated with him, was familiar with Federal tax matters. That member of the firm suggested the*304 pre-nuptial agreement. Will discussed the plan with Hyde from as early as June 1938. On September 17, 1938, the decedent signed the trust agreements. Will went over them with decedent, "high spotted the documents, the important provisions" and discussed them "rather thoroughly" with him. Will gave decedent the ante-nuptial agreement, suggesting that he take it with him and discuss it with Miss O'Neil, and it was arranged for her to come in on Monday the 19th to sign or discuss it. She was in Kenilworth, Illinois, and decedent went there to spend the week-end, the 17th and 18th of September. He did not discuss the ante-nuptial agreement with her but told her that Hyde and Will were writing up some papers to that effect. She came in on Monday, September 19th, to Hyde's office. She, decedent, Hyde and Will were present. She then met Will for the first time. He suggested that she should have a lawyer look over the papers, but she felt it to be unnecessary. She read the ante-nuptial agreement, which mentioned the trust agreements, and they were explained to her "more or less" before she signed. She realized, when she read the agreement, that the transfers had previously been made. *305 Decedent and Harriette O'Neil were married October 29, 1938, and lived together until his death. On April 24, 1939, the decedent executed his will, giving, devising, and bequeathing all of his property to his wife. His children were not mentioned in the will. He did not discuss it with his wife and she did not at the time know that he had executed it. Decedent was not seriously ill at any time prior to his last illness, except for colds, and was not attended by a physician until the day he died, when he wife, against his will, called a doctor. He had for two or three weeks complained of not feeling exactly as usual. He stayed in bed two days before his death. The physician, about ten o'clock in the morning, told her decedent's kidneys were not functioning correctly, and for him to keep warm and stay in bed. He died about two o'clock that day. The certificate of death states coronary thrombosis due to kidney infection as cause of death. The lessees of the Michigan Avenue property exercised their option thereon in the spring of 1939 and paid for the property $300,000, one-half of which went to Mrs. Jenks, who requested Hyde to invest it in securities for her. She still owns them. *306 The decedent, on September 3, 1940, amended the trust of the Michigan Avenue property to provide a minimum income to him of $6,000 per year (if necessary, to be paid from principal) except any payment necessary to Mrs. William S. Jenks. In December 1940 Mrs. Jenks created a trust, drawn largely by Will. Therein she transferred her half interest in the Hartford property to Hyde Gillette in trust to pay the income to her four nieces and nephews, or their issue, for life, the corpus to go to them on termination. The petitioner filed the decedent's estate tax return on or about March 3, 1945, with the Collector for the Sixth District of California at Los Angeles, California, showing a total estate tax payable of $45,064.39, which was paid as follows: 9-27-44$12,158.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,905.90 The return did not include as a part of the decedent's gross estate the ownership of any interest in the two tracts of real estate described above, respectively, as the Hartford Building and the Lake Beulah, Wisconsin, property. In his notice of deficiency herein the respondent has included in the value of the petitioner's gross estate the value of the two tracts of real estate*307 under section 811(c) of the Internal Revenue Code. Opinion Did the Commissioner err, under the facts found above, in including the Beulah Lake and Hartford Building properties in decedent's gross estate? No question is raised as to the values used by him. The question is solely one as to whether the transfers were in contemplation of death. Moreover, the respondent does not argue that the decedent was in poor physical or mental condition at the date of transfer. In fact, the decedent appears to have been in good condition until very shortly before his death more than five years later at the age of 80 years. It is not necessary to cite cases to support the statement that the question is one of fact on all of the evidence, or that the petitioner, the Commissioner having determined that the transfers were made in contemplation of death, has the burden of proof to demonstrate the contrary. Upon careful examination of the facts which we have found in detail, we have come to the conclusion that the petitioner has not met the burden imposed. We find the evidence to be in a peculiar condition. Though the crux of the matter is as to what the decedent contemplated, *308 the record is almost, if not quite, barren as to what he actually had in mind. A great deal of evidence appears as to what his son and son-in-law intended in drawing the instruments which the decedent signed; also to show the intention of Jenks, and to a lesser degree of his wife. But remarkably little gives any real view of the state of mind of the decedent, as to what he did or did not contemplate, in making the transfers involved. What little does appear does not, in our opinion, by any means suffice to overcome the presumption of correctness of the Commissioner's determination. It does not appear necessary to discuss at great length the facts involved and above detailed. The petitioner's position amounts to this: That Jenks, for himself and his wife, opposed the marriage because of her financial interest, in securing protection on the note, resulting in the transfer of the Hartford Building property; and because of decedent's failure to pay expense of the Lake Beulah property, and desire that a new wife not intrude therein, resulting in the transfer of the Lake Beulah summer home. Yet the Hartford Building property was, as to decedent's interest, estimated by him as worth about*309 $175,000, and no issue is taken on the Commissioner's figure of $120,621.32, whereas the indebtedness on decedent's note was about $45,000 including interest, while the record indicates nothing as to what decedent owed on upkeep of the Lake Beulah property, valued as to his one-half at $10,000. Yet we find both properties transferred, not merely as security for the amounts owed by the decedent, but absolutely, and to his children directly as to the Lake Beulah property, and, as to the Hartford property, to them as beneficiaries of a trust, which was to save decedent from the $45,000 indebtedness - though, in fact, the record fails to show any release of decedent upon such indebtedness by Mrs. Jenks, the holder. It is, of course, at once obvious that a conveyance of the property by way of security, by mortgage or deed of trust, conditioned upon payment of the indebtedness on the decedent's note without the further transfer of the corpus to the children as beneficiaries, would have given Mrs. Jenks just the same protection as she received from the conveyance of the Hartford Building; and it is equally obvious that the outright deed of the Lake Beulah property was unnecessary to protection*310 of the petitioner's share of expense thereon, so far as finance is concerned. Why then did the decedent make the further and financially unnecessary conveyance to the children? The element of lack of financial necessity therefor destroys, in our view, the argument that the dominant motive in the transfers was the satisfaction of Jenks and wife. It simply is not reasonable to say that it was necessary to transfer to the children, as well as secure Mrs. Jenks. Nothing in the record indicates that she, or her husband for her, required conveyances of the breadth actually made. On the contrary, Will, when asked "was it Mr. and Mrs. Jenks' thought at all, did they insist that the provisions go in, the two trusts relative to the distribution of corpus to the children at termination of such trust?" answered "No, they did not," and later said that their primary interest in the Hartford trust was to get the note secured. He, the attorney in the matter, did not recall that he "ever explained to them the complete distribution of the corpus of those trusts." As to the provisions in the Hartford trust that on termination corpus would go to the children Hyde testified: "The attorneys thought of that*311 provision." Of course, that the Jenks family was not interested in conveyance to the children does not dispose of the nonfinancial interest the Jenks family had in the Lake Beulah summer home and a new wife not intruding therein, but that is clearly a very minor factor in this problem, affecting only that piece of property and insufficient to explain transfer of outright title thereto. Will testified with respect to that property: "* * * the feeling there on Mr. Jenks' part was not perhaps as strong as it was as to the business properties," though he, Jenks, did say decedent did not always pay his share. The Jenks' attitude does not explain outright conveyance of the Lake Beulah property to the children. The above has not considered the conveyance of the Michigan Avenue property (not directly involved, because admittedly the property is within gross estate). But it we find of little weight or importance on this question, for two reasons: First, it was of very little money interest to the Jenks family, who are argued to be the prime movers here, since it could only produce, for the satisfaction of the note to Mrs. Jenks, whatever part of $1,000 a year the Hartford Building did not*312 produce. (In fact, the Hartford Building produced the $1,000 per year, and had, during 1938, produced, prior to the transfers, $903.75 in cash for Mrs. Jenks, though for several earlier years it had produced after payment of expenses, taxes, and mortgage interest, no net income). Second, though the Michigan Avenue property was covered by a mortgage-secured bond for $75,000 to assure delivery of title under an option, upon which bond Mrs. Jenks was liable, nevertheless the trust set up covering that property was wholly modifiable and revocable, was in fact later modified by the decedent. Therefore, such a trust gave Mrs. Jenks no real or substantial assurance of protection on the bond. Again, moreover, conveyance of the corpus of the trust to decedent's children upon termination of the trust is seen to be unnecessary to protection of Mrs. Jenks and, therefore, her protection does not appear as the real or dominant reason for the transfer to the children. That the parties hoped the decedent would not revoke the trust is a frail reed upon which to support the idea that the transfer would protect Mrs. Jenks. Its frailty is demonstrated by the fact that he modified the trust in 1940. By*313 complete revocation Mrs. Jenks would have been left as she was before the transfer in trust. Considering the relative unimportance of the provisions for protection of Mrs. Jenks, compared with the values transferred to the children, the fact that they were the natural objects of decedent's bounty, and were unprovided for in his will later made in October 1939, together with the fact that the record does not disclose the decedent's intentions as to his children, we find it impossible to conclude that the dominant motive of decedent in this matter was the wish to placate the Jenks family and marry with harmony in the family. The children, or all but one, were, on the record, satisfied in any event that he marry. Not only is there dearth of evidence to support the petitioner's theory, but there is no small indication to the contrary, that is, that there was contemplation of death. The test is not consciousness of imminent death. "It is contemplation of death, not necessarily of imminent death, to which the statute refers." United States v. Wells, 283 U.S. 102; Iglehart v. Commissioner, 77 Fed. (2d) 704. Therefore, the fact that decedent was in good mental and*314 physical condition for about five years after the transfers does not control. But in considering these transfers on September 17, 1938, we may not reasonably disregard the contents of the ante-nuptial agreement of September 19th, drawn in connection with the transfers and presented to him on the same date. The evidence is that on September 17th decedent was given the ante-nuptial agreement to take to Miss O'Neil over the week-end, that it recited the transfers as well as what property he had remaining, that therein he agreed to provide by inter vivos trust, will or otherwise, from the income from the Michigan Avenue property, $1,500 a year for the life of his wife commencing with his death if she is living at the time of his death and she, repeatedly referred to as his "wife, or widow" waived dower and homestead rights in his property and authorizes him during life or, at his death, his heirs to encumber or convey such property. To fail to see in such language, in such close connection with the transfers, indication of contemplation of death in the transfers, though not necessarily imminent demise, would be blindness to reality and to disregard an integral part of the whole plan. In*315 our view, the protection of Mrs. Jenks on the note is given too much importance by the petitioner. We are not convinced that it is shown to be the dominant motive of the decedent. Without further discussion, we conclude and hold that the petitioner has failed to show that the transfers of the Hartford and Lake Beulah properties were not, as determined by the Commissioner, in contemplation of death within the meaning of section 811(c) of the Internal Revenue Code. Because of stipulation as to deductions of additional administration expense. Decision will be entered under Rule 50.